Good morning, and may it please the court. I'm Michael Brown. I'm here on behalf of the Retired Employees Association of Orange County, also known as REAC. I'd like to begin by expressing our thanks to the court for expediting this appeal. Tomorrow marks the sixth anniversary of the filing of the complaint in this case. And as the court is aware, these are very important benefits to my clients. Six years is an awful long time for thousands of fixed income retirees to wait in the hopes of having their retirement health benefits reinstated. And the preliminary question this court must answer in this appeal is, I believe, a fairly easy one. After the California Supreme Court's ruling in REAC 3, was REAC entitled to rely on extrinsic evidence to prove an implied contract promise to provide the benefit that we call the retiree premium subsidy? Or was the district court correct to rule for the second time that extrinsic evidence is categorically and necessarily irrelevant in the absence of an expressed legislative promise to provide the benefit? I say it's an easy question because this court has already answered it. This court answered the question in the Sonoma County case, a case involving claims very similar to REAC's claims. We refer to that opinion as Sonoma 2. And the answer in Sonoma 2 was unequivocal. Even in the absence of an expressed legislative promise, retirees may rely on extrinsic evidence to establish an implied contract right to receive a retirement health benefit. But Sonoma 2, in Sonoma 2, this court did more than simply hold that extrinsic evidence is cognizable. It constructed a framework for courts to use to apply the guidance of REAC 3. This court held that to establish a claim for an implied retirement health benefit under REAC 3, retirees must show two things. First that the county created a contract, for example, a memorandum of understanding or MOU, that was adopted by board resolution and included a promise of health care benefits. Okay. So we're talking about the 1984 resolution? Which resolution are you referring to? We're talking about all the resolutions that adopted all of the MOUs during the relevant period, 1985 to 2007. Each of those memorandum, memoranda of understanding was adopted by the state as resolutions themselves. They become part of the legislation. The 1984 resolution is what instituted the practice of pooling. But we don't rely on that resolution as establishing the promise of pooling as part of the contract. Okay. So the promise of pooling arises from what? It arises from a course of dealing including a bargaining history from 1985 to 1992 in which the county brought to the bargaining table this premium methodology that we call the premium subsidy and used it as a bargaining chip during labor negotiations. Did you have an MOU issued every year? Two years, I think, on average. Every two years? Yes. And so from 1985 to 1992, the retiree premium subsidy was at the bargaining table discussed extensively. It wasn't only discussed. The county put on paper, on charts that it showed to the unions, the monthly cash value of the benefit. It put that cash value on these charts next to the pension benefit, clearly suggesting to the unions that this was a contractual right that they would receive if they agreed to the county's terms, proposed terms to restructure their retiree medical program. Part of one of those terms was the county got access to $150 million in a disputed pension surplus fund. It was one of the county's goals was to resolve the dispute with the unions over this massive amount of money. The other goal was to simply bring peace to its relationship with labor, a relationship that had been marked with contentious debate for many years about whether or not it was a contractual right. Here's the question I had in reading all of this. Let's assume that the district court was wrong to say no extrinsic evidence because it, for the reasons that you've laid out with Sonoma and the others. So there can be some extrinsic evidence, but where is the extrinsic evidence? The resolution or the MOU or the contract, you can have an implied term, of course, but where is the, where do I look to see the implied term? Where do I look to see the resolution? The resolution, Your Honor, is a memorandum of understanding. The memorandum of understanding contains an express promise that retirees are allowed to remain enrolled in the county health plan throughout their retirement. The county has admitted in this case that that enrollment benefit was a lifetime vested benefit. So you have that express promise. What Sonoma too says and what the retiree support group versus Contra Costa case and the Sacramento County case and the district court have both followed is that once you establish an MOU with an express promise of a retiree health benefit, you then apply, that triggers, in effect, contract interpretation rules. And under contract interpretation rules, as the REACT III court said, experience and practice can trigger additional, in other words supplemental terms, in addition to the written terms in the contract. So the promise to provide the benefit arises from the longstanding practice of providing it. It arises from the negotiations where express promises were made at the bargaining table. Not only that this was a benefit that was being provided, but that it would continue to be provided if the unions agreed. It's evidenced by... Is there anything in any of the MOUs that relates to the question of pooling? Because the pooling question is different from the question of getting the lifetime benefit. I would say it's different, but it's closely related. There's nothing in the MOUs that says anything about a rate methodology. The MOUs refer to and promise that retirees get to remain enrolled. And I would say the enrollment benefit, the concept of what comprises the group in a group insurance plan, adheres in the concept of a group insurance plan. If you promise group health insurance, but there's no limit on how the county can put the group together, it becomes a meaningless benefit. And history showed that the premium subsidy and the pooling methodology kept premiums down substantially for retirees. And so it was very closely linked and gave value to, in effect, the express promise of being enrolled. It was not the same. It's not mentioned in the MOUs specifically, but it was central. To use the words of the RUI 1 court, Judge Guilford cited RUI 1, but I think applied it incorrectly. The implied promise is central to the party's bargain. And it's central to the party's bargain because their course of dealing shows it was central. They spent years negotiating this. The county was motivated to make express promises in its presentation saying uniform rates will continue if you agree to our terms. And so what REAC 3 said, I think clearly, but I think, but apparently there was some room for disagreement because Judge Rawlinson in Sonoma 2 dissented. I think REAC 3 said that once you have an express promise that you can get the rules of contract interpretation to apply, including that implied terms can arise from course of conduct, including that implied terms stand on equal footing with express terms, including the concept that they govern a very large relationship amongst a very large number of people. And so in that context, even more so you look to extrinsic aids to supplement the terms of the party's agreement. I think in Sonoma 2 and the cases cited in REAC 3, they talked about the sorts of extrinsic evidence that matter. Sonoma 2 refers to the party's longstanding practices. And in these cases, the plaintiffs, the Sacramento case I think as well, but certainly also the Contra Costa case, the plaintiffs were seeking to imply a term that was nowhere reflected in the MOU. In the Contra Costa case, there was a promise that you could remain enrolled and the retirees were saying there was an implied promise that the county would pay 80 percent of the premium. The 80 percent promise was not in the MOU. And Judge Teigar, if I'm pronouncing it correctly, concluded that under Sonoma 2, a claim had been stated because there was an express health benefit and the implied benefit arises from the application of contract principles. Once you establish that the express benefit is contained in an MOU that's passed by board resolution. And in this case, there's no question that the MOUs were adopted by board resolution. That hasn't been an issue. We believe that REAC has satisfied both elements of the Sonoma case. There's no dispute that the MOUs on which REAC relied were adopted by resolution. There's no dispute that contained express language reflecting the enrollment benefit. The enrollment benefit, which is the right to remain enrolled in county plans upon retirement. That benefit, the county says, is a vested lifetime benefit. And then REAC adduced compelling and largely undisputed extrinsic evidence of the sort that has been deemed cognizable by REAC 3 and Sonoma 2. This is where I have a problem, counsel. I sort of follow all your premises until you get to this point. I know that you want us to look at extrinsic evidence. And I still want to know what the extrinsic evidence is. And I don't think that the extrinsic evidence can be, well, that's always the way it was. No, and that's not at all what we're depending on entirely. It's not at all what we're depending on entirely. I think it's one factor. And in the course of cold, longstanding practice, a factor. The key to me, the key extrinsic evidence is the bargaining history. And there are cases that say one way to construe a collective bargaining agreement, extrinsic evidence, includes the history of bargaining. And there's another. Okay, so what do we have, what's the bargaining history here? The bargaining history is between 1985 and 1992. The county and the unions discussed this and fought over it extensively. The county made. The fact that it was the subject of negotiations is not at all surprising. Did anything ever get memorialized in a piece of paper? Well, at the bargaining table, it was memorialized. It was not memorialized in the MOU. At the bargaining table, there were charts handed to the unions showing, this is our proposal. Retiree pooling will continue. Right, but those are only good for two years, right? Yet the MOU is coming out every two years. Those have to be renewed at some point. When MOUs are renewed by the nature of collective bargaining, terms that are settled get carried through until one party wants to change them. But when you say the terms are settled, that's where I'm having some trouble jumping from the fact that it was discussed to now it becomes an implied term. Well, it wasn't only discussed, it was promised at the bargaining table. Okay, good. Where's the evidence of that? David Carlaw's, let me see if I can find the record citation. There's a group of documents that we submitted showing what the board's chief labor negotiator provided at those meetings. Initially, it was a quantification of the retiree premium subsidy. This is how much it's worth. Then the unions, there's a, the unions come back and say, are you going to keep doing it if we accept your proposal? Dave Carlaw initially says, yes. But then at a subsequent meeting, he comes back with charts that show that our proposal includes the continuation of pooling. Uniform rates will continue. And it's a promise, it's a promise that is coextensive with the enrollment benefit? Therefore, it's invested in lifetime? Well, it's one of our pieces of evidence as to why it's lifetime. It's because it is closely connected to the enrollment benefit. It gives value to the enrollment benefit. Since the premium subsidy was revoked, the value of enrollment has gone down drastically because premiums have skyrocketed. Retirees are now in their own risk pool. And so the value of being able to enroll in a group health plan becomes a lot different when the county makes retirees their own group. Whereas the promise, the implicit promise, the promise made at the bargaining table was retirees will remain pooled with active employees. Okay. So the, so the, the Carlaw Declaration is the best evidence you've got? Of the, at the beginning of the history of negotiation, the Carlaw evidence shows what was said at the bargaining table. Is that a declaration that you have in the record? It is, it's a declaration that attaches the actual documents that Mr. Carlaw. This is where he's basically saying that unions made clear that they wanted to put up the money and then they said no. The county said we're already using county money to fund the state. Yeah, I'm sorry, I said declaration. What I mean are the attachments. There are documents that literally come from what was at the bargaining table. We can literally go back and see what was happening at the bargaining table. Those are those chart things about values? Yeah, exactly. The pension benefit and the, but they end up saying this will be a benefit. This will continue under the new plan. So they don't just talk about it, they say this will continue. So where does it say this will continue under the new plan? Where do I look to find that? I think I have it here. ER-2 at 58. ER-7 at 1260. That's the Carlaw. These are the documents that Dave Carlaw uses. He was the one who made the presentations. ER-2 at 1260 to 1220. ER-2 at 157. ER-2 at 149. I think our reply brief at 23 is where it's spelled out and described. So if we were to agree with you just hypothetically that some extrinsic evidence should have been considered, then is it your view that you win upon consideration of the extrinsic evidence or that there's a factual issue upon consideration of the extrinsic evidence? Yes is our first choice. The first one, and yes, we believe that. You can't be both. Well, we believe that the evidence really is factually undisputed. I think it's largely a matter of legal conclusions now. And we think this court can look at the evidence and make a conclusion. Well, that was getting to my other question, is that even if extrinsic evidence were to be considered, it sounds like your view is that if there's not a factual issue, it then becomes a legal determination as to whether this extrinsic evidence is sufficient to show the implied term. Exactly. And at a minimum, I don't know if they're inconsistent, at a minimum it raises a tribal issue. I guess that's what I'm saying. Well, I know the tendency to want to have it both ways, but I'm thinking it either raises a material issue or it doesn't. So that also, of course, is a legal conclusion to be drawn. So do you want to save the remaining time? If I could just very quickly note, there's another important piece of evidence that the district court didn't even talk about, and that is the county's admission in a PMK deposition that the premium subsidy was in the MOU. Ms. Carlucci said in several places and in several different ways that the retiree medical program was in the MOU and had to be negotiated out of it. The retiree medical program, in her own words, included the premium subsidy. So the county's, and this isn't just really extrinsic evidence, I don't think, in the normal way we consider extrinsic evidence. This is a party admission saying, going to the core issue of this case, was this benefit in the MOU? The county's PMK designate testifies, yes, it was in the MOU. And the county's made some attempts to back out of that language six months later. They don't work. So the core issue in this case is the subject of a county admission. I think the county's admission is not a mistake. It wasn't, she wasn't badgered by counsel. It was perfectly consistent with the course of dealing and how the parties viewed this benefit. So this is Ms. Carlucci? Carlucci. Yes. So we have her deposition testimony where she says we negotiate changes, et cetera. And then she has a declaration that says, we negotiated with the understanding there were no implied terms and only expressed terms that were approved by the Board of Supervisors. Because there's no language about any subsidy, the subsidy was not a term. I believe the second declaration, the declaration is her legal conclusion attempting to back out of the ramifications of her factual testimony in the deposition. The deposition, she said, we had to negotiate this out of the MOU because it was in the MOU. And the county attempted later to have her say, well, I didn't really mean the subsidy. I meant the other benefits. But it's very clear repeatedly that when she said retiree medical program, she meant the specifically to having to negotiate the subsidy out of the MOU. I'm sorry, by subsidy you mean? I'm sorry, the pooling of the actives and retirees, the fact that retiree premiums are subsidized by active employee premiums, what we call the retiree premium subsidy. Right. But a premium subsidy is different from a decision as to whether or not you pool the two groups. Pooling results in the subsidy. And the parties use the terms interchangeably. Sometimes it's called the pooling benefit, the commingle benefit, the rate subsidy. The pooling results in the subsidization of retiree premiums by virtue of being included in the pool with generally younger active employees that have lower medical claims expenses. I'll reserve my 11 seconds. All right. We're going to give you 12. Good morning. This case has been a bit of a moving target for us in terms of trying to ascertain from the appellants what is the extrinsic evidence that they're going to need to show the commitment. This case started out as a 1984 rate resolution case, and that's where we look to, and it's been evolving over time. So now we know, and there is a settled record, that there's no, nothing says that there's going to be pooling anywhere in terms of anything that went to the Board of Supervisors that was approved. And this is solely a case based upon an implied obligation that comes from a collection, bits and pieces of things that are before the Court now. So the guidance by the California Supreme Court, which this Court sent the question to the Supreme Court on whether there could be an implied obligation, is important. And we start with Government Code Section 25300 that requires compensation to be set by ordinance or resolution. You have a presumption that a statutory scheme is not intended to create vested rights, and the party asserting that has to overcome that presumption. The Court must proceed cautiously because of this heavy burden. And two critical points that they have not met here, one being the language or circumstances accompanying passage of the legislation must clearly evince a legislative intent to create vested rights, and the implication of the suspension of legislative control must be unmistakable. Unmistakable. So that's the backdrop that the Court faces in evaluating whether the parole evidence, the extrinsic evidence that is before you is sufficient to overcome that standard. And we believe, just as Judge Guilford found, there's no reasonable way that the record supports that case. There are two key time frames that get mixed up here with the record. With the Carlaw deposition reference just now, you, that was about 1993 when the grant plan was negotiated. But the initial period when the pooling went into effect, and the only express instruments that reference anything related to pooling are when the Board was faced with an accounting error in 1984, and the staff of the County of Orange came to the Board and said, look, this plan is underfunded, and we need to raise the rates. And they raised the rates. They had two options, raise them by 107 percent or raise them by 75 percent. And they chose for that plan year only, 1985, to pool in order to raise the rates. And they chose to do that. The legislative file includes complaints by the retirees saying, hey, our rates just went up by 75 percent. So there's an irony in terms of whether that's a benefit here. And there's nothing in the legislative record that commits the Board to continue adopting rates in that fashion. And if you look at the, that's why we put before you the actual action by the Board, which concerning the setting of rates, happens every year for every plan year, the Board has a staff report that comes before it. And for that plan year only, the Board, you know, considers whether to adopt the rates that are recommended. So that's the 1984 period. I'm going to come back to that. But I would say, you know, if each and every, in each and every year the Board acted in this legislative capacity to presumption, again, that any legislative body enjoys that they're not giving up the right to legislate. And if anybody claims that, every court has said there's a very heavy burden to overcome to say that the legislative body has given up its right to legislate. Why do that every year? Why agendize it, the rates? Why give the retirees input on what the rates should be? And why do that for each plan year? So the problem with the presentation of evidence here is that you've got this sort of hodgepodge, bits and pieces of evidence from different periods of time. And I think you have to look at those two periods, 1984 and 1980 and 1993. So let's go to the evidence. You start, again, with the 1984 rate resolution. And that was adopted in 1984, applied for the 1985 plan year. It's an accounting error. It says nothing about discontinuing into the future. And I want to correct one thing that counsel said. He said that when he's looking to the MOUs, he said that there is a line in the MOU giving an express promise to continue for continued enrollment in a retiring medical plan. That's not what the MOU says. The MOU says, there's one line. It says, retirees may change health plans at the time of retirement. Retirees may change health plans at the time of retirement. I'm going to come back to that. But in terms of the rate legislation each year, if you go to the period beginning in 1990, the board, as further evidence, we think of the board considering, hey, yes, there is this effect from pooling. Do we want to continue? The cost estimates are put before the board. And there is a, there are projections brought to the board saying, well, here's what you would say if you eliminated that benefit, which we believe is strong evidence that the board is given that legislative choice, which it undertook in 2006 when it went through the restructuring. So that's the rate resolutions. They're all in the record. They're exercised each plan year. And there's nothing in any of those rate resolutions, nothing in the legislative file that says anything about on and on and on and on. So let's go to the MOUs. We have an admission that it's not in the MOU. The term that was used by counsel in the briefing was it's lurking. It's lurking in the MOUs. And so, again, in this, before this court, there's one line. Remember, REAC tells us that we have to look to the ordinance or resolution and we have to start with the language and then see if there are implied terms that are closely connected to the term that they're seeking to have you adopt. How could that be closely connected to a pooling methodology? I think that's just a very attenuated argument. I mean, giving an employee at the time of retirement the option to change plans, what does the pooling have to do with that? Let's assume there was pooling or not pooling. You're still, you have the option, whatever the rates are in any plan year, to choose a health plan at the time of retirement. So right off the bat, I think you can say that just is insufficient. That's an insufficient language hook, if you will, given the requirement under Government Code Section 25300 that there ordinance, and this is the MOU, you're pointing to one sentence. And that's, there's no close connection to pooling with that sentence. So may I stop there? There's a question, really a threshold question of the use of extrinsic evidence, which you are implicitly addressing, but we haven't really put it on the table. And I read the district court as basically closing the door to any of the evidence, as opposed to saying I considered it, but it doesn't rise to the level to tip or to meet their obligation. And I think there is a significant difference. So I'm concerned that the district court didn't want to consider any of it, as opposed to determining that it may or may not actually meet the requirements. We think the district court did consider all of the extrinsic evidence. He ultimately concluded it was not relevant. And he was not inclined to consider what he viewed basically, I think, tying to the Seventh Circuit point about ad hoc, after-the-fact recollections that are 20 years old about what somebody said or did at the bargaining table if it's not in the contract. But this is really, I think the court ultimately thought this was a Sappington situation where, yes, you've got extrinsic evidence that you've looked at, but let's go back to the requirements of what's in the resolution or ordinance and look to the language. And so I think the way I read the order is, yes, he did say all this stuff is ultimately irrelevant, but that doesn't mean he didn't look at it. I believe he did look at it. He just concluded it was not persuasive in the context of the heavy burden that he faced in order to determine that there was some vested right here. So I think it's incorrect for counsel to say that we're saying under no circumstances can you ever consider extrinsic evidence. I think you clearly can use extrinsic evidence if there's some ambiguous provision and you're using it as a rule of construction to trying to ascertain statutory intent. And so the court did that here and concluded that nothing that they've brought forward in terms of this sort of presentation of different things over a period of time was persuasive. So I also want to mention on the one term that is now here that we're looking at, which you can change medical plans at the time of retirement, one would have thought there would be bargaining history on that. If that's what you're relying on in terms of saying, hey, this is the sentence that we're hinging our entire case on, along with this other course of conduct and so forth. But in terms of language, this is the one thing that you'd look at. You'd think that you'd see some bargaining history on that. And there's none. So ultimately what you have is a collection of evidence, some of which comes – some of which and most of which relates to the 1993 medical plan. So we've talked about the rate resolutions. Let me bring to the court, if I could, to the 1993 plan. The 1993 plan is the express document that talks about a subsidy in the form of a grant being given to retirees. And the Carlisle testimony that was just referenced, that refers to the 1993 grant plan and what was being discussed relative to that plan. And I want to also say, I think – I took his deposition. And I know that there were subsequent, you know, declarations in terms of what was submitted in terms of what he said. But here's what he said. Mr. Carlisle – this is in our supplemental excerpts of Record 9 – no specific – there was no specific discussion on the practice – cooling into the future, correct? Answer, there was no verbal commitment to carry it into the future. And question, and no discussion one way or another on the combining of the pool continuing into the future. Witness, no. Yeah, going back to it, I didn't make any promises. Remember, he's the guy testifying against the county when he was representing the county in the negotiations. I didn't make any promises. I'm not going to say I didn't talk about it, but there wasn't a promise that it would go on indefinitely. Question, SDR 11, line 6, are you aware of any contract anywhere that provides that upon retirement, retirees will receive the benefit of a pooling benefit or anything like that? Answer, no, I'm not. Mr. Carlisle, the complaint says that county – this is on SDR 12, page 2. The complaint states that county retirees were promised health benefits, including the pooling benefit. Are you aware of such a promise, Mr. Carlisle? Answer, no, I'm not. So I think when you say you're relying on Carlisle's testimony, read his testimony. I mean, I took his deposition, and it's very clear there was never a commitment. What I would ask this Court – I mean, we couldn't find it in terms of your body of jurisprudence, but in the Seventh Circuit, the Seventh Circuit very clearly said, look, we're not going to, you know, we don't – we're going to discount after the fact, ad hoc statements made years after a particular transaction. And in that instance, did not give weight to those. I mean, here, imagine what a slip of the – Well, let's talk about whether that's what these are. Do you put bargaining history into that category? Well, if it's bargaining history about the term of the MOU itself, that might be relevant. And – but remember, you're talking about something – look how – look what a slippery slope you're on. If 20 years later, you enter – an agency has an integration clause in an MOU and says, these are the terms of the MOU, and somebody says 20 years later, oh, no, we talked about this. In fact, we had a table that Mr. Carlisle wrote up, and it showed the pooling benefit, which, by the way, did go on for 15 years. So if he's saying at the table, this is a benefit that's going to go on for some years, it did go on for some years. But imagine what a slippery slope that is if that can sort of turn 25-300 on its head. Now, all of a sudden, we've got people testifying, you know, I would call it table talk. I mean, I do some labor negotiations where you're sharing a lot of information. Here's what the rates would be if this. Here's what the rates would be if that. They're trying to get a grant plan in place. And that's going to trump what's in writing? I mean, I – Well, but there's two different issues here. One is whether it trumps it, and the other is whether it should be considered to see whether it trumps it. In other words, one is the standard you'd have to meet, and the other is, look, because Sonoma is quite clear that, you know, various experience and practice can be considered to determine if there's an implied contract. So you're ultimately saying, well, you can't trump it with this stuff. But that doesn't really answer the question as to whether it might be appropriate in the first place to look before you make that decision. Well, I don't think anybody's foreclosing the idea of looking at some evidence that can overcome, again, the elements that I said. Implication of suspension of legislative control, unmistakable. Does that overcome that? Is this language or circumstances concerning – is this event that's concerning passage of the legislation or adoption of the contract that goes to the – you know, goes into the MOU or not? Here it didn't go into the MOU. Is this happening at the time of an instrument that was adopted that we're seeking to interpret? And that's why you've got this sort of collection of evidence that's coming from a variety of different sources that ultimately, in the end, doesn't really get you there in this case. So I wanted to also turn, if I could, to the Carlucci point. Because if you look at the Carlucci testimony, you'll see sort of a wide-ranging discussion about a retiree medical program, a plan, a benefit, and there was some discussion back and forth of, is this the program or is this the plan? She did, when they said, hey, I've got you. You said the wrong thing in this depot and I got you. One little hook. It's in the MOU. If you look at the testimony, she's talking about the grant plan. And when she submitted a supplemental declaration that spoke to the grant plan, to clarify that, she added the language that Your Honor mentioned where she's saying, hey, there's no implied terms here. We're talking about terms that made it into the MOU, number one. And number two, remember, the plan itself has a very, very explicit no vesting clause. So if you're going to rely on oral evidence to get into a, to say that this was, the pooling benefit was a vested right and this all stems primarily from the 1993 plan negotiations, you take the no vesting clause with you at the time and you know that the rule is you can't have an oral, you can't have extrinsic evidence that conflicts with express instrument. And the express instrument is no vesting. And we reserve the right to make changes. You know, the last thing I would say is, you know, I, it is true. We're six, we're coming up on six years into a plan and for the, on behalf of the county, this has been successful. We've continued to cover approximately 6,000 retirees in quality group health plans. I know that the Affordable Care Act has changed this to a certain degree in covering other people, but at the time there was substantial risk of disqualification if you had a prior medical condition. And, you know, like other employers, the county came face to face with an enormous unfunded liability, brought to it at 1.4 billion and took reasonable steps to make the retiree plan sustainable. It's now sustainable. I mean, at the time all options were on the table, including let's just eliminate the plan. I've got clients who are asking, let's just get out of the business of retiring medical altogether. Because this whole vested rights thing, people can say now 20 years later, I had a vested right to that. This is high stakes and not worth it. So we view this, and I know that we all do, everybody in this courtroom faces higher premiums and everybody deals with that. It's the reality of the world that we face. We view this as a success story. And with that, I'll respectfully submit. Thank you. Mr. Brown will give you a couple of minutes of rebuttal. Beginning where Mr. Hartinger left off, my clients think that calling this a success story is absurd. It's almost insulting. The county was not facing any financial crisis with regard to this benefit. This benefit was coming out of general funds. It represented .023 percent of the county's budget. .023 percent. The other benefit, the grant benefit, was pre-funded and was experiencing a funding problem. This benefit was funded from a separate source. There was no financial crisis. The 1.4 billion number is something Mr. Hartinger throws out, which includes the grant benefit, which is not at stake in this litigation. Most of it is the grant benefit. And the remaining 400 million of it is mostly assuming that the premium subsidy continues for the next 30 years. It has nothing to do with whether it's paid to my clients, the people who retired before 2008. It is a tiny number for a county the size of Orange County, the obligation at stake here. In premiums, premium inflation has gone up two and three times. So to say that this is still great, everyone has great coverage, we all face premium inflation, this is different. This is putting retirees into their own separate pool in a way that made their premiums go up drastically. Many are being priced out of coverage. I believe in the Kaiser plan now, the annual premium is $21,000 for an HMO. That's 67 percent of the average pension check. Sixty-seven percent. When in 2007, when pooling was still in effect, it was something like 24 percent of the average pension check, which is still a lot. But imagine that difference and imagine the effect it has on retirees, on fixed income, average $30,000 a year. I never said that this benefit was lurking in the MOU. Mr. Hardinger lifted it from Judge Guilford's order and made it look in the brief as if I said it. I never said it. I wouldn't have used the word lurking. It wouldn't reflect that. It seemed unlikely. Yeah. So it's in the papers. It's a misrepresentation. I take offense to the fact that it's being repeated again today. The grant plan, the non-vesting, there is a non-vesting provision in the grant plan, the separate benefit. It limits vesting. But in that plan, it says this plan document only applies to the benefits provided under this plan. And the county has It was not a benefit under the plan. So the express terms of the grant plan say this plan document does not apply to the premium subsidy. And the county is now trying to, I guess, say that there's an implied construction of that statute that makes it apply to every benefit. But the assumption is the opposite. If the legislature says this benefit is invested and doesn't say this other one is invested, the presumption under Inclusio Unio is that it didn't intend the other benefit not to be vested. Mr. Hardinger says each year the board can change its methodology to the premiums. That's simply not true. The county has admitted that it had to go to the labor unions to negotiate the change to the premium methodology. So it wasn't as if the board showed up every year and said, hey, let's decide whether to pool or not. Once it decided it wanted to stop pooling, it had to go to the unions and negotiate that change. And the sort of absurd result of this case is the county has admitted that an active employee has had a contract right to continue to its future, his or her future, retiree premium subsidy. Had to be negotiated. We had to engage in some exchange. If we wanted to take it away, we meet in the county. But the minute you retire, you lose all protection to that same benefit. So you have a protected retirement benefit until the day you retire. And on the day you retire, the county can take it away at its will. That seems like an absurd way to read a contractual understanding. Thank you. Thank you. I'd like to thank both counsel for your arguments and for the briefing in this case. Retired Employees v. County of Orange is submitted and we're adjourned for the morning. This court for this session is adjourned.
judges: McKeown, Gould, Bybee